J.S26043/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LAWRENCE A. GAINES, | : | |
| | : | |
| Appellant | : | No. 1938 EDA 2013 |

Appeal from the Judgment of Sentence May 9, 2013
In the Court of Common Pleas of Northampton County
Criminal Division No(s).: CP-48-CR-0003210-2012

BEFORE: BENDER, P.J.E., SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED SEPTEMBER 02, 2014**

Appellant, Lawrence A. Gaines, appeals from the judgment of sentence entered in the Northampton County Court of Common Pleas following his conviction for first-degree murder.[1]  Appellant challenges the sufficiency of the evidence and the trial court's exclusion of a defense witness.  We affirm.

The trial court summarized the facts of this case as follows:

> During the trial, the Commonwealth presented evidence showing that in the late evening on July 2, 2013, or the early morning of July 3, 2013, Tony Williams ("Williams") was at 613 Ferry Street in the City of Easton (the "Property") to purchase drugs.  The Property was a known

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a).

drug house in which individuals would purchase and use drugs inside of the residence.

At approximately 12:30 or 1:00 a.m. on July 3, 2013, Williams smoked crack cocaine and "hung out" at the Property during the morning. While he was "hanging out" at the Property, other individuals, including [Appellant], were inside of the house. Williams was a friend of [Appellant], who was also known as "L." [Appellant's] "role" at the house was the "muscle," which meant he was to watch the door and to make sure there was "no trouble" at the door.

Later that morning, at approximately 5:50 a.m., Caroline Thompson picked up her son, William Thompson, a/k/a "Poncho" ("Decedent"), from somewhere along Route 22 and transported him in her vehicle to an area near a church on Walnut Street and Locust Street in the city of Easton, Pennsylvania. After exiting the vehicle, [Decedent] told Mrs. Thompson and her boyfriend, Ivan, who was also in the vehicle, that he would return home in twenty minutes. Mrs. Thompson was living in Easton, so it was possible for [Decedent] to walk home from the location near the church.

At approximately 6:00 a.m., Williams was sitting in the living room of the Property when someone began knocking at the back door. Upon initially hearing the knocking, Williams did not get up to answer the door because the owner of the Property, a man named "Ben," had told Williams earlier that he did not want anyone else in the house and that he wanted the house "shut . . . down for the night." After the individual continued to knock, Williams eventually got up and went to the back door. Williams then observed that it was [Decedent] knocking on the door.

[Decedent] was waving a $20 bill in his hand and pleading with Williams to let him inside the Property. Williams told [Decedent] that Ben would not allow anyone else inside and, thus, he refused to let [Decedent] come into the Property. Williams, who had been talking to [Decedent] through the closed door, turned around and returned to the living room where he sat down and talked

to [Appellant], who was wearing blue jeans and a black shirt. While they were talking, [Decedent] continued "boom-boom banging on the door."

Williams and [Appellant] initially tried to ignore [Decedent's] continued knocking on the door, but at one point [Appellant] got up, indicated that he was tired of the banging on the door, and expressed concern that the continued knocking would cause a neighbor to call the police. [Appellant] then went to the door and began speaking to [Decedent] through the door without actually opening it.

At some point soon thereafter, the back door opened and [Appellant] and [Decedent] were continuing to converse, but the tone of the conversation was escalating. Williams could not hear the substance of the conversation, but observed that [Appellant's] and [Decedent's] voices began to get louder. Then, [Appellant] exited the house and closed the door behind him. At no point did [Decedent] go into the house.

Once [Appellant] exited from the house, Williams could still hear [Appellant] and [Decedent] conversing in escalating tones on the back porch. Williams then got up and began moving toward the back door to investigate and possibly resolve any conflict.

Williams exited from the house and walked along the alleyway near the back door of the Property. Williams could see [Appellant] and [Decedent] continuing to talk, and he attempted to intervene. While Williams was attempting to talk to [Appellant] and [Decedent], "[o]ut of nowhere, [Appellant] hit [ ] "[Decedent]" with a "vicious" hit. [Decedent] did not hit [Appellant] prior to being hit. [Decedent] then fell to the ground and [Appellant] got on top of [Decedent] and hit him a couple of times and also kicked him in the back of the head.

Williams was able to pull [Appellant] off of [Decedent], and [Decedent] got up and walked away down the street. Williams and [Appellant] remained in the street and they were talking about [Appellant] and [Decedent]. Williams thought that "[Decedent] is gone, so the fight is done."

Although Williams thought that the fight was over, he saw [Decedent] coming back down the street with a "big stick." Williams observed that the stick was not "real sturdy" and it "was like a rail, like an old house rail or something."

[Decedent] ran at [Appellant] with the stick and hit him in the shoulder or back causing both [Appellant] and [Decedent] to fall to the ground. At the time, Williams did not believe that [Appellant] could see that [Decedent] was about to hit [Appellant] with the stick. As [Decedent] was coming down the street with the stick, Williams was afraid of being hit, but was not afraid of dying.

After the stick hit [Appellant], it broke in half and half of the stick remained in [Decedent's] hand. [Decedent] and [Appellant] began scuffling while they were on the ground, and [Appellant] was able to get up off the ground before [Decedent] did. [Appellant] then took a knife out of his back right pocket. [Appellant] said something similar to "oh, it's like that? Yeah, it's like that[,]" and he began to stab [Decedent] with the knife while [Decedent] was still on the ground. The stabbing occurred in the same general area right in front of the house on the Property.

After seeing [Appellant] stab [Decedent], Williams began yelling "L, L" and grabbed [Appellant]. [Decedent] was able to get up and leave, and Williams saw a flow of blood running down the back of [Decedent's] leg. Williams and [Appellant] also fled from the area, with Williams going to his sister's house. Williams did not know where [Appellant] went because they fled in opposite directions.

At approximately 6:00 a.m., Catherine Malitsis ("Malitsis") picked up her husband from the Northampton County Prison. As they drove away from the prison and approached a stop sign on Ferry Street, Malitsis's husband said, "oh, my God," as he saw a male walking towards her car. As Malitsis's vehicle was stopped at the stop sign, the individual asked her to call 911 and then he fell to the ground. This individual was bleeding profusely from his legs. Malitsis called 911 and then drove around the block and waited for the police to arrive.

Officer Jamie Luise of the City of Easton Police Department received a call at approximately 6:15 a.m. to respond to an incident at the 600 block of Ferry Street. Although Officer Luise was at the police station at the time of the call, he arrived at the aforementioned location approximately one minute after the time of the call. As he approached the area in his vehicle, Officer Luise observed a black male face down in the roadway intersecting Ferry Street and South Union Street. He observed that there was a large amount of blood on the male's person and running down Ferry Street.

Because Officer Luise could tell that the individual was injured, he called for emergency medical services to assist the individual and for additional police units to secure the scene. Officer Luise and his partner attempted to aid the individual and locate the wounds. Officer Luise and his partner actually removed the individual's pants and underwear and noticed wounds in his buttocks and upper thigh region. At the time, the individual was unconscious, with a faint pulse, but otherwise unresponsive. Soon thereafter, members of the Easton Fire Department, who were also medics, arrived at the scene and tended to the victim. EMS workers arrived later with an ambulance, and the victim was placed in an ambulance.

On July 4, 2012, Detective Joe Alonzo of the City of Easton Police Department assisted in arresting [Appellant]. At the time, [Appellant] was wearing jeans and a black t-shirt. [Appellant] was also carrying a cell phone. Detective Alonzo did not notice that [Appellant] was injured and [Appellant] did not complain of any injuries.

Detective Alonzo collected [Appellant's] clothing, and he observed that there appeared to be blood stains on his clothing. In particular, there appeared to be blood stains on [Appellant's] jeans and his sneakers.

On July 11, 2013, Nicole Blair ("Blair") and her family were barbecuing in the back yard of her residence located at Apartment 3 on 30 South 5th Street in Easton, which is near Ferry Street. While outside, Blair discovered a knife stuck in the wood on the side of a gate to the back yard.

The knife had a silver and black handle on the front "and it had like tools on it."

Upon hearing that Blair saw the knife, her husband and brother came over and opened the knife. They saw that there was blood on it, and they wrapped it in a tissue and brought it into their apartment. They thought it was a fishing knife and did not immediately contact the police about locating it. However, approximately two days after locating the knife, Blair contacted the police after learning about a stabbing up the street from where she lived. Because Blair, her husband, Brandon Perkins, and her brother, John Blair, touched the knife, they provided the police with DNA samples.

Trial Ct. Op., 10/25/13, at 4-10 (footnotes and citations to record omitted).

At trial, Daniel Reagan, an inspector with the City of Easton Police Department and lead investigator, interviewed Appellant. He testified, *inter alia*, as follows:

A: . . . I was up front with him, and I let him know his name came up in this investigation, that's obviously why we're out to look for him because we want to know his side of the story.

At which point he said—basically, he said he had nothing to do with it. He wasn't there. He didn't do it. He knew [Decedent]. They had an argument in the past. Basically, they were friends. And he was not there. Had nothing to do with the killing of him.

Q: Now, at any point during this interview, did you make any suggestions about the possibility of self-defense?

A: Yes, I did.

Q: Can you describe why you went down that road? Is that your belief? Is that your thought?

A: At that point in the interview, no, it wasn't my thought. But because he was going to great lengths to distance

himself from what [sic] the witness information we had, the evidence we had at that point, I didn't expect him to come in and say that.

So once I was realizing he wasn't going to say he was there, obviously, that was a significant contradiction of information we had. So either everyone else was lying or he was lying. So it's a tactic to get someone to put themselves there in a case like this to say, well, maybe it was self-defense; otherwise, how was all this evidence and why the witnesses saying [sic] that you were there.

\* \* \*

Q: Now, you had an opportunity to sit with [Appellant] and view him and interact with him.

A: I did.

Q: About how far away? Were you pretty close to [Appellant]?

A:Yeah. We were seated just at a table.

Q: And when did you interview him, what date?

A: I interviewed him on July 4, approximately 10:01 a.m., I believe it was.

Q: So it was about 24 hours or so after the death of [Decedent]?

A: Approximately.

Q: Did you notice if he had any injuries on him?

A: He did not have any injuries.

Q: Did he complain of any injuries to you?

A: Not of any injuries. He mentioned that he had kidney problems.

Q: But no—he didn't need medical attention?

A: He did not need any medical attention. He didn't mention any injuries.

Q: Now, this interview that you had with [Appellant], was it audio and video recorded?

A: It was.

N.T., 5/7/13, at 191-93, 194-95. The recording of the interview was admitted into evidence without objection from the defense. *Id.* at 196.

At trial, Samuel Land, M.D., a board certified forensic pathologist testified as to the cause and manner of Decedent's death. N.T., 5/8/13, at 37, 39-40. Dr. Land testified regarding the autopsy he performed on Decedent on July 3, 2012, at 10:30 a.m. *Id*. at 43. He stated:

A: [Decedent] had multiple areas of trauma. He had scrapes or abrasions to his head and face. He had multiple stab wounds to the right arm, right groin, right buttocks, and right thigh.

\* \* \*

Q: Now, you, I believe, made mention there's five stab wounds; is that correct?

A: Yes.

Q: How did you identify them? Did you number them?

A: Well, I label the stab wounds with numbers but only for my convenience. . . .

\* \* \*

Q: If we can put up Commonwealth's Exhibit 87 to the right. It you can explain that photo.

A: This is a photograph of stab wounds number one and two . . . .

Q: Now, if we can start with what you identified as stab wound number one. Can you describe the wound and your findings to the jury? . . .

A. . . . This was a penetrating stab wound to the right buttock. The wound went in to the right buttock, went through the skin, soft tissue, the muscle. It was about five to six inches in depth. The wound was what we call boat shaped. I was able to say the implement used, one sharp edge and one blunt edge. This wound caused bleeding throughout the wound pathway.

Q: Now, is this wound fatal?

A: Well, all penetrating sharp force trauma to the body is potentially fatal. Alone, this—this was not immediately life threatening.

\* \* \*

A: This is wound number two. Again, through [sic] closer to the lower part of the buttock near the thigh. This wound was also boat shaped. It also had one sharp edge and one blunt end.

The wound passed through the skin, the soft tissue, and the muscle of the right buttock. There was bleeding and tissue destruction throughout the wound pathway, and the depth of the wound was about five to six inches in depth.

\* \* \*

A: . . . Wound number three is in the back of the right thigh. This wound was somewhat atypical in that it was not your typical boat shape. It has one sharp area and one blunt area, but it appears that the implement was twisted causing some further cutting as it was removed.

This wound went into the skin, went through the skin, the soft tissue, and the muscle of the right thigh. There was bleeding and tissue destruction along the entire

wound pathway, and the depth of the wound is about three inches.

* * *

A: Commonwealth's Exhibit No. 89 is a photograph of [Decedent] now lying on his back. . . . And in the right bicep region, there is a stab wound that goes through the skin, into the muscle of the right bicep.

The depth of the wound was about two inches in depth. There was bleeding along the wound pathway. This wound did have one sharp edge and one blunt edge.

* * *

Q: If we can put up Commonwealth's Exhibit 91. Now, this is what you described as number five; is that correct?

A: Yes.

Q: And if you could describe a little bit about this injury?

A: . . . This is the right thigh. This is the right groin.

* * *

The wound went through the soft tissue, through the skin, through the soft tissue, and the muscle of the right thigh. It also went through the femoral artery, which is the main artery that feeds the leg.

It went—there was a complete perforation, front and back, of the femoral artery. The implement went further into the muscle of the right thigh. This caused massive bleeding, exsanguination, bleeding out, both externally and into the soft tissues of the thigh and into the back, into the pelvis, and into the back.

Q: Now, you were talking about this artery. It is a vital part of our body or vital organ?

A: Yes, it is.

Q: Can you describe to the jury what that means, being it's vital?

A: A vital portion of the human body means that if it's damaged, your life is in jeopardy.

*Id.* at 50, 51-52, 53, 54, 55-57.

Appellant did not testify in his defense or present any evidence. The jury found Appellant guilty of first-degree murder. He was sentenced to a mandatory period of life imprisonment without the possibility of parole. Appellant filed post-sentence motions which were denied. This timely appeal[2] and contemporaneous Pa.R.A.P. 1925(b) statement of errors complained of on appeal[3] followed. The trial court filed a responsive opinion.

Appellant raises the following issues for our consideration:

1. Whether the [v]erdict was against the sufficiency of the evidence in that evidence does not support a conclusion that [Appellant] acted with malice or the specific intent to kill where [Appellant] had been attacked by a weapon-wielding man and used a knife to defend himself and no evidence would support an inference that he intentionally and deliberately sought to pierce the femoral artery such that the denial of the post-sentence motion in this regard was erroneous?

---

[2] Appellant's post-sentence motions were denied on May 31, 2013. The thirtieth day thereafter was Sunday, June 30, 2013. *See* Pa.R.Crim.P. 720(A)(2)(a). His notice of appeal was filed on July 1, 2013 and was therefore timely. *See* 1 Pa.C.S. § 1908 (providing that when last day of any period of time referred to in any statute falls on Saturday, Sunday, or legal holiday, such day shall be omitted from computation).

[3] We note that the court subsequently ordered Appellant to filed a Rule 1925(b) statement on July 3, 2013.

> 2. Whether the exclusion of a defense witness who would have testified that the implement wielded by the decedent (a railing used as a club) would have warranted forceful intervention because it was "a weapon readily or apparently capable of lethal use" was erroneous such that the denial of the post-sentence motion in this regard was also erroneous.

Appellant's Brief at 6.

First, Appellant argues that the evidence was insufficient to support a conviction of first-degree murder, as it did not show he had the specific intent to kill. While conceding that the use of a deadly weapon on a vital part of the body can raise the inference of specific intent, Appellant avers that he acted in self-defense. Appellant asserts:

> In this case, [he] and [Decedent] had an altercation in which no weapon was produced or used. It was only after that first fight had ended that [Decedent] picked up a weapon (the baluster) and ran headlong at [him] striking him with the stick with such force and momentum that both were driven to the ground. [Appellant] stood his ground, as he was legally entitled to do, and defended himself by stabbing his attacker in the buttocks.

*Id.* at 11 (footnote omitted). He claims that he "stood his ground" pursuant to 18 Pa.C.S. § 505(a) and (b)(2.3)(i)-(iii)(B), and defended himself by stabbing his attacker. *Id.* We find no relief is due.

The standard of review for a challenge to the sufficiency of evidence is *de novo*, as it is a question of law. **Commonwealth v. Ratsamy**, 934 A.2d 1233, 1235 (Pa. 2007)

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . does not require a court to ask itself whether **it** believes that the

evidence at the trial established guilt beyond a reasonable doubt. Instead, it must determine simply whether the evidence believed by the fact-finder was sufficient to support the verdict. . . .

*Id.* at 1235-36 (citations and quotation marks omitted).

When reviewing the sufficiency of the evidence, an appellate court must determine whether the evidence, and all reasonable inferences deducible from that, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offense beyond a reasonable doubt. . . . In applying this standard, the reviewing court must bear in mind that: the Commonwealth may sustain its burden by means of wholly circumstantial evidence; the entire trial record should be evaluated and all evidence received considered, whether or not the trial court's ruling thereon were correct; and the trier of fact, while passing upon the credibility of witnesses and the weight of the proof, is free to believe all, part, or none of the evidence. . . .

*Id.* at 1237 (punctuation and citations omitted).

The Pennsylvania Crimes Code defines first degree murder:

**(a) Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

18 Pa.C.S. § 2502(a).

Our Pennsylvania Supreme Court has stated:

In order to sustain a conviction for first-degree murder, the Commonwealth must demonstrate that a human being was unlawfully killed; the defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill, i.e., the killing was performed in an intentional, deliberate, and premeditated manner. **Specific intent may be established through circumstantial evidence, such as the use of a deadly weapon on a vital part of the victim's body**. . . .

- 13 -

***Commonwealth v. Ramtahal***, 33 A.3d 602, 607 (Pa. 2011) (citations

omitted and emphasis added).

The defense of self-defense

> requires evidence establishing three elements: "(a) [that the defendant] reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat." Although the defendant has no burden to prove self-defense . . . before the defense is properly in issue, "there must be some evidence, from whatever source, to justify such a finding." Once the question is properly raised, "the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in self-defense." The Commonwealth sustains that burden of negation "if it proves any of the following: that the slayer was not free from fault in provoking or continuing the difficulty which resulted in the slaying; that the slayer did not reasonably believe that [he] was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save [him]self therefrom; or that the slayer violated a duty to retreat or avoid the danger." . . .

***Commonwealth v. Mouzon***, 53 A.3d 738, 740-41 (Pa. 2012) (citations and

footnote omitted).

After careful review of the record, including the trial testimony, the

parties' briefs, and the opinion of the Honorable Edward G. Smith, we affirm

this issue on the basis of the trial court's opinion. **See** Trial Ct. Op. at 12-21

(holding Commonwealth presented sufficient evidence to convict Appellant of

first-degree murder and to show that he did not act in self-defense where

evidence showed Appellant was "initial aggressor by sucker punching

[Decedent] and then continuously punching and kicking him until Williams was able to pull [Appellant] off" and Appellant repeatedly stabbed Decedent while Decedent was vulnerable and lying on ground).

Lastly, Appellant contends the trial court erred in excluding a defense witness who would have testified that the implement wielded by Decedent "would have warranted forceful intervention because it was 'a weapon readily or apparently capable of lethal use.'" Appellant's Brief at 12. Appellant contends that he attempted to call Sergeant Timothy Hornbaker of the Northampton County Sheriff's Department "to elicit testimony concerning what would happen if the stick was used in an attempt to attack somebody in the courtroom which would have demonstrated that this was a weapon 'readily or apparently capable of lethal use.'" *Id.* at 13.

The trial court suggests that Appellant did not raise, prior to this appeal, the issue of whether it erred in precluding Sergeant Hornbaker from testifying that the stick was a weapon capable of lethal use. Trial Ct. Op. at 25. We agree with the trial court that Appellant did not seek to call Sergeant Hornbaker to testify about whether the railing or baluster wielded by Decedent was readily or apparently capable of lethal use. Although Appellant sought to ask the Sergeant at trial whether he would allow someone in the courtroom to attack people with "a stick" or what he would do in the event that happened, there was no offer of proof pertaining to the rail used by Decedent.

At trial, Appellant stated to the court that he wished to call Sergeant Hornbaker to testify for the defense:

> [Defense Counsel]: . . . I would have one witness I would like to call, it would be Sergeant Hornbaker of the sheriff's department. This is a self-defense case. This is something the jury will have to wrestle with what force was necessary and what the circumstances were.
>
> . . . The offer of proof would be initially to have him **describe how many deputies are in the courtroom, what they carry on their utility belts, and what he would do if I picked up a stick and tried to attack somebody in the courtroom**. . . .

N.T., 5/8/13, at 14 (emphasis added). The court denied the request to call the witness because it would intrude upon the province of the jury. *Id.* at 15. Appellant's counsel then stated he would like to introduce Sergeant Hornbacker as an expert witness:

> [Defense counsel]: If I may just further make a record. I could be offering and try to qualify Sheriff Hornbaker as an expert in the protection of people and use of force. I'm not asking what he would do specifically. The question would be phrased, you would not hit somebody with a stick.
>
> The use of hypotheticals is proper with experts. And if the facts should not be hypothetical, we could use the facts as they have been produced by the Commonwealth if we were outside at the time of this crime, you know, and just run through all of the facts that have been established, and then pose the question: Would you let that happen. I think that is appropriate.
>
> The Court: Isn't that a rhetorical question though? If you're going to ask anybody, be it an expert or non-expert, are you going to let somebody hit you with a stick, whoever's going to say yes?

- 16 -

[Defense Counsel]: But I think that is the argument. . .

.

*Id.* at 16. The court denied the request. *Id.* at 19.

At the close of the Commonwealth's case, the court reiterated its ruling:

> [Defense Counsel]: . . . If I just may make the record clear, I would not be eliciting testimony from Sheriff Hornbaker whether he thought [Appellant] acted reasonably. Because I believe that would invade the province of the jury.
>
> I would be asking questions more along the lines of would he in this environment, the courtroom environment, permit anybody to strike another person with that stick.
>
> Not whether it's reasonable, not whether it's legal, not whether it's justified.
>
> And I would not be asking him does he think or speculate that what [Appellant] did was proper or reasonable. I believe that is for the jury.
>
> The Court: What would the relevance of that testimony, except on the issue of the objective element, whether [Appellant's] belief was reasonable in light of the facts as they appeared to him?
>
> [Defense Counsel]: I think it goes to the objective facts that you can't go around and hit people with sticks and it's appropriate to stop them, whether it was appropriate in this case, whether it ultimately meets part of the definition of the charges they charged him with, I think that's up to the jury.
>
> But I would like to argue with the facts of record that certain—drawing a hypothetical to match these facts I should be given that opportunity.
>
> \* \* \*

> The Court: My prior ruling stands that goes to presenting expert testimony on whether you hit, that would not be a benefit to the jury and it could go directly towards that objective evidence whether it was reasonable. If it does not go towards that issue, then it's completely irrelevant.
>
> Because there's no other relevance to an expert witness taking the stand and saying you cannot go around hitting people with a stick.

*Id.* at 74-77.

"Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a); *see also Commonwealth v. Smith*, 47 A.3d 862, 866 (Pa. Super. 2012), *appeal denied*, 60 A.3d 536 (Pa. 2012). Accordingly, we find the issue waived.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/2/2014

IN THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
                                      )
            v.                  )        No. CP-48-CR-3021-2012
                                        )
LAWRENCE GAINES,            )        Superior Court No. 1938 EDA 2013
                                        )
                 Defendant.     )

## MEMORANDUM OPINION

The defendant, Lawrence Gaines, appeals from the judgment of sentence entered on May 9, 2013. This memorandum opinion is filed pursuant to Pennsylvania Rule of Appellate Procedure ("Pa.R.A.P.") 1925(a).

## I. Procedural History

On or about July 4, 2012, the City of Easton Police Department charged the defendant with Criminal Homicide[1] for allegedly killing William B. Thompson on July 3, 2012. The late-Magisterial District Judge Gay Elwell held a preliminary hearing in this case on October 12, 2012, after which the sole charge was bound over to this court for trial.[2] The Honorable F.P. Kimberly McFadden assigned the case to the Honorable Emil Giordano on October 17, 2012. The defendant was formally arraigned on November 28, 2012.

It appears that during a conference before Judge Giordano on April 26, 2013, the defendant sought to have the court remove his court-appointed counsel, Attorney Sletvold, as his counsel and the defense moved for a continuance of the trial date. [Transcript of Proceedings, 4-26-13, at 4-11.] On April 30, 2013, Judge Giordano entered an order denying both the continuance request and the defendant's request for the appointment of new counsel.

---

[1] 18 Pa.C.S. § 2501(a).
[2] Prior to the preliminary hearing, attorney Robert E. Sletvold, Esquire, was appointed to represent the defendant in these proceedings.

Shortly after Judge Giordano's order, this matter was reassigned to the undersigned for trial. We held a jury trial from May 6, 2013 through May 9, 2013, after which the jury found the defendant guilty of first-degree murder. We then held a sentencing hearing, after which we imposed a mandatory period of life imprisonment without the possibility of parole.

The defendant timely filed post-sentence motions on May 20, 2013.[3] On May 31, 2013, we denied the post-sentence motions without a hearing. The defendant then filed a timely Notice of Appeal on July 1, 2013.[4] Along with the notice, the defendant filed a Statement of Matters Complained of pursuant to Pa.R.A.P. 1925(b).[5] In the concise statement, the defendant complains as follows:

1.  The verdict was against the sufficiency of the evidence in that evidence does not support a conclusion that the defendant acted with malice or the specific intent to kill where the defendant had been attacked by a weapon-wielding man and used a knife to defend himself and no evidence would support an inference that he intentionally and deliberately sought to pierce the femoral artery. The denial of the post-sentence motion in this regard was erroneous.

2.  The exclusion of a defense witness who would have testified that the implement wielded by the decedent (a railing used as a club) would have warranted forceful intervention because it was "a weapon readily or apparently capable of lethal use" was erroneous. The denial of the post-sentence motion in this regard was also erroneous.

[Defendant's Statement of Matters Complained Of.]

---

[3] The tenth day technically fell on Sunday, May 19, 2013. Nonetheless, according to the Rules of Construction, the tenth day falls on Monday, May 20, 2013. *See* 1 Pa.C.S. § 1908 ("Whenever the last day of any such period shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation.").

[4] Similar to the filing of the post-sentence motions, the thirtieth day of the period to file a timely notice of appeal technically fell on Saturday, June 29, 2013. Per the Rules of Construction, the thirtieth day fell on Monday, July 1, 2013.

[5] When we received a copy of the notice of appeal, the defendant's concise statement was not attached. As such, we entered an order on July 3, 2013, requesting a concise statement from the defendant. We later learned that the defendant had attached a copy of his concise statement to the Notice of Appeal.

## II. Discussion

As indicated above, the defendant has raised two issues as part of his appeal. The defendant contends that the evidence presented at trial was insufficient to convict him of first-degree murder. The defendant also argues that we erred in refusing to permit a defense witness to allegedly testify that the implement used by the decedent would have warranted "forceful intervention" by the defendant because the implement was readily or apparently capable of lethal use. We respectfully submit that neither of these claims have merit.

### A. The Defendant's Challenge to the Sufficiency of the Evidence

#### 1. Standard of Review

The appellate standard of review in analyzing an appellant's sufficiency of the evidence claim

> is to determine if the Commonwealth established beyond a reasonable doubt each of the elements of the offense, considering all the evidence admitted at trial, and drawing all reasonable inferences therefrom in favor of the Commonwealth as the verdict-winner. *Commonwealth v. Eichinger,* 591 Pa. 1, 915 A.2d 1122, 1130 (2007), *cert. denied,* 552 U.S. 894, 128 S.Ct. 211, 169 L.Ed.2d 158 (2007); *Commonwealth v. Mitchell,* 588 Pa. 19, 902 A.2d 430, 444 (2006), *cert. denied,* 549 U.S. 1169, 127 S.Ct. 1126, 166 L.Ed.2d 897 (2007). The trier of fact bears the responsibility of assessing the credibility of the witnesses and weighing the evidence presented. In doing so, the trier of fact is free to believe all, part, or none of the evidence. *Mitchell, supra* at 444.

*Commonwealth v. Pruitt,* 951 A.2d 307, 313 (Pa. 2008).

#### 2. Elements of the Crime of First-Degree Murder

For the appellate court to sustain a first-degree murder conviction,

> the Commonwealth must establish beyond a reasonable doubt that: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and the specific intent to kill. 18 Pa.C.S.A. § 2502(a); *Commonwealth v. Laird,* 605 Pa. 137, 149, 988 A.2d 618, 624–25 (2010). The Crimes Code defines an intentional killing as a "willful, deliberate and premeditated killing." 18 Pa.C.S.A. § 2502(d). It is well settled that the Commonwealth may prove malice and specific intent to kill by means of wholly

3

circumstantial evidence, including the use of a deadly weapon on a vital part of the victim's body. [*Commonwealth v. Briggs*, 12 A.3d 291, 307 (2011)].

*Commonwealth v. Parrish*, -- A.3d --, 2013 WL 5354336, at *3 (Pa. Sept. 25, 2013). Specific intent to kill can also be inferred "from the application of deadly force to the victim's person." *Commonwealth v. Pruitt*, 951 A.2d 307, 313-14 (Pa. 2008). In addition,

> []malice has been defined as a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." "A finding of malice based on a 'recklessness of consequences' requires that a defendant be found to have consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury." Further, malice may be inferred after considering the totality of the circumstances.

*Commonwealth v. Thomas*, 656 A.2d 514, 516 (Pa. Super. 1995) (citations omitted).

### 3. The Evidence Presented at Trial

During the trial, the Commonwealth presented evidence showing that in the late evening on July 2, 2013, or the early morning of July 3, 2013, Tony Williams ("Williams") was at 613 Ferry Street in the City of Easton (the "Property") to purchase drugs. [Notes of Trial – Day Two, 5-7-13 ("Day II Tr."), at 33-35.] The Property was a known drug house in which individuals would purchase and use drugs inside of the residence. [*Id.* at 35.]

At approximately 12:30 or 1:00 a.m. on July 3, 2013, Williams smoked crack cocaine and "hung out" at the Property during the morning. [*Id.* at 36.] While he was "hanging out" at the Property, other individuals, including the defendant, were inside of the house. [*Id.*] Williams was a friend of the defendant, who was also known as "L." [*Id.* at 37.] The defendant's "role" at the house was the "muscle," which meant he was to watch the door and to make sure there was "no trouble" at the door. [*Id.* at 37-39, 58-59.][6]

---

[6] Williams indicated that "no trouble" meant that the defendant was designated as the individual to resolve any problems due to people losing control due to the effects of drugs. [Day II Tr. at 39.]

4

Later that morning, at approximately 5:50 a.m., Caroline Thompson picked up her son, William Thompson, a/k/a "Poncho" ("Poncho"), from somewhere along Route 22 and transported him in her vehicle to an area near a church on Walnut Street and Locust Street in the city of Easton, Pennsylvania. [*Id.* at 14-16, 17.] After exiting the vehicle, Poncho told Mrs. Thompson and her boyfriend, Ivan, who was also in the vehicle, that he would return home in twenty minutes. [*Id.* at 16.] Mrs. Thompson was living in Easton, so it was possible for Poncho to walk home from the location near the church. [*Id.*]

At approximately 6:00 a.m., Williams was sitting in the living room of the Property when someone began knocking at the back door. [*Id.* at 39, 40, 43, 64.][7] Upon initially hearing the knocking, Williams did not get up to answer the door because the owner of the Property, a man named "Ben," had told Williams earlier that he did not want anyone else in the house and that he wanted the house "shut . . . down for the night." [*Id.* at 35, 39, 43, 64.] After the individual continued to knock, Williams eventually got up and went to the back door. [*Id.* at 39, 43.] Williams then observed that it was Poncho knocking on the door. [*Id.* at 39, 43, 64.]

Poncho was waving a $20 bill in his hand and pleading with Williams to let him inside the Property. [*Id.* at 43, 64.] Williams told Poncho that Ben would not allow anyone else inside and, thus, he refused to let Poncho come into the Property. [*Id.*] Williams, who had been talking to Poncho through the closed door, turned around and returned to the living room where he sat down and talked to the defendant, who was wearing blue jeans and a black shirt. [*Id.* at 43, 54, 65.] While they were talking, Poncho continued "boom-boom banging on the door." [*Id.* at 43.]

Williams and the defendant initially tried to ignore Poncho's continued knocking on the door, but at one point the defendant got up, indicated that he was tired of the banging on the

_____

[7] Although Williams admitted to smoking crack cocaine earlier that morning, he was "fine" at this time. [Day II Tr. at 57.]

5

door, and expressed concern that the continued knocking would cause a neighbor to call the police. [*Id.* at 43, 57-58, 66.] The defendant then went to the door and began speaking to Poncho through the door without actually opening it. [*Id.* at 43, 66.]

At some point soon thereafter, the back door opened and the defendant and Poncho were continuing to converse, but the tone of the conversation was escalating. [*Id.* at 43.] Williams could not hear the substance of the conversation, but observed that the defendant's and Poncho's voices began to get louder. [*Id.* at 43, 67.] Then, the defendant exited the house and closed the door behind him. [*Id.* at 43-44, 66.] At no point did Poncho go into the house. [*Id.* at 44.]

Once the defendant exited from the house, Williams could still hear the defendant and Poncho conversing in escalating tones on the back porch. [*Id.*] Williams then got up and began moving toward the back door to investigate and possibly resolve any conflict. [*Id.*]

Williams exited from the house and walked along the alleyway near the back door of the Property. [*Id.* at 40-42, 44.] Williams could see the defendant and Poncho continuing to talk, and he attempted to intervene. [*Id.* at 44.] While Williams was attempting to talk to the defendant and Poncho, "[o]ut of nowhere, [the defendant] hit[] Poncho" with a "vicious" hit. [*Id.* at 44, 46, 67.] Poncho did not hit the defendant prior to being hit. [*Id.* at 46.] Poncho then fell to the ground, and the defendant got on top of Poncho and hit him a couple of times and also kicked him in the back of the head. [*Id.* at 45, 46.]

Williams was able to pull the defendant off of Poncho, and Poncho got up and walked away down the street. [*Id.* at 45, 46, 47, 68.] Williams and the defendant remained in the street and they were talking about the defendant and Poncho. [*Id.* at 47.] Williams thought that "Poncho is gone, so the fight is done." [*Id.*]

6

Although Williams thought that the fight was over, he saw Poncho coming back down the street with a "big stick." [*Id.* at 47, 68.] Williams observed that the stick was not "real sturdy" and it "was like a rail, like an old house rail or something." [*Id.* at 48.]

Poncho ran at the defendant with the stick and hit him in the shoulder or back causing both the defendant and Poncho to fall to the ground. [*Id.* at 47, 69.] At the time, Williams did not believe that the defendant could see that Poncho was about to hit the defendant with the stick. [*Id.* at 48.] As Poncho was coming down the street with the stick, Williams was afraid of being hit, but was not afraid of dying. [*Id.* at 52, 69.]

After the stick hit the defendant, it broke in half and half of the stick remained in Poncho's hand. [*Id.* at 47.] Poncho and the defendant began scuffling while they were on the ground, and the defendant was able to get up off the ground before Poncho did. [*Id.* at 47, 48, 49.] The defendant then took a knife out of his back right pocket. [*Id.* at 47, 50, 69-70.][8] The defendant said something similar to "oh, it's like that? Yeah, it's like that[,]" and he began to stab Poncho with the knife while Poncho was still on the ground. [*Id.* at 49, 50, 51, 70.] The stabbing occurred in the same general area right in front of the house on the Property. [*Id.* at 50.]

After seeing the defendant stab Poncho, Williams began yelling "L, L" and grabbed the defendant. [*Id.*] Poncho was able to get up and leave, and Williams saw a flow of blood running down the back of Poncho's leg. [*Id.* at 50, 70.] Williams and the defendant also fled from the area, with Williams going to his sister's house. [*Id.* at 59.] Williams did not know where the defendant went because they fled in opposite directions. [*Id.* at 59, 60, 61.][9]

---

[8] Williams recognized the knife as being in the defendant's possession prior to this incident. [Day II Tr. at 53, 70.]

[9] In addition to Williams' eyewitness testimony, we note that Blane Brandon ("Brandon"), a corrections officer with the Northampton County Prison, left the prison and was heading to the parking lot when he heard a commotion near the intersection of Union and Ferry Street. [Day II Tr. at 149, 154, 155.] Brandon observed three individuals arguing, and then two of them started fighting. [*Id.*] Brandon saw that "tall one" hitting the "other one," with the "third one" trying to pull the tall one off of the "other one" in a manner in which it appeared that the third one was trying to "break it up." [*Id.*] The third one attempted to break up the altercation several times, and during this time

7

At approximately 6:00 a.m., Catherine Malitsis ("Malitsis") picked up her husband from the Northampton County Prison. [*Id.* at 18-19.] As they drove away from the prison and approached a stop sign on Ferry Street, Malitsis's husband said, "oh, my God," as he saw a male walking towards her car. [*Id.* at 20-21, 22.] As Malitsis's vehicle was stopped at the stop sign, the individual asked her to call 911 and then he fell to the ground. [*Id.* at 21.] This individual was bleeding profusely from his legs. [*Id.*] Malitsis called 911 and then drove around the block and waited for the police to arrive. [*Id.*]

Officer Jamie Luise of the City of Easton Police Department received a call at approximately 6:15 a.m. to respond to an incident at the 600 block of Ferry Street. [*Id.* at 23, 24.] Although Officer Luise was at the police station at the time of the call, he arrived at the aforementioned location approximately one minute after the time of the call. [*Id.* at 24.] As he approached the area in his vehicle, Officer Luise observed a black male face down in the roadway intersecting Ferry Street and South Union Street. [*Id.* at 25.] He observed that there was a large amount of blood on the male's person and running down Ferry Street. [*Id.*]

Because Officer Luise could tell that the individual was injured, he called for emergency medical services to assist the individual and for additional police units to secure the scene. [*Id.*

---

the "tall one" hit the "shorter one" a couple of times and when the shorter one hit the ground, the tall one kicked him a couple of times. [*Id.* at 150, 153.] The entire altercation lasted five or ten minutes until Brandon "hollered down to them." [*Id.* at 150, 152.] The men then went their separate ways, and Brandon went back into the prison to retrieve something he had forgotten. [*Id.* at 150, 155-56.] When he returned in about five or ten minutes, the shorter man, a black male, was lying in the middle of the street. [*Id.* at 150, 151, 156.] Brandon did not call the police because he thought the altercation had concluded. [*Id.* at 153.]

Brandon indicated that the taller man, who was approximately 6'2" and wearing a black shirt and blue jeans, was the aggressor. [*Id.* at 150.] The shorter man also did not appear to be aggressive; rather, he was trying to defend himself. [*Id.* at 151.] Brandon did not observe any weapons on either person. [*Id.* at 157.]

In addition to Brandon, Jason Bailey ("Bailey"), who lived a couple of houses down from the Property, was looking out his bathroom window at approximately 6:00 a.m. when he saw a man that he knew as "Thompson" was "wrestling" with another person on the street. [*Id.* at 158-61, 164.] Thompson was on the bottom, and the other individual was on top of him. [*Id.* at 161.] Bailey saw the other individual take a knife and stab the back of Thompson's shoulder blade. [*Id.* at 161-62, 163, 165.] Both men then got up and Thompson said, "you got your shots in, now I'm going to get my shots in." [*Id.* at 162.] Bailey saw Thompson grab a stick from the ground near the side of a house and go after the other man. [*Id.* at 162, 166.] The next thing that Bailey saw was Thompson going back up the street while holding his leg. [*Id.* at 162, 167.]

8

at 29.] Officer Luise and his partner also attempted to aid the individual and locate the wounds. [*Id.*] Officer Luise and his partner actually removed the individual's pants and underwear and noticed wounds in his buttocks and upper thigh region. [*Id.* at 29-30.] At the time, the individual was unconscious, with a faint pulse, but otherwise unresponsive. [*Id.* at 30.] Soon thereafter, members of the Easton Fire Department, who were also medics, arrived at the scene and tended to the victim. [*Id.*] EMS workers arrived later with an ambulance, and the victim was placed in an ambulance. [*Id.* at 30.]

On July 4, 2012, Detective Joe Alonzo of the City of Easton Police Department assisted in arresting the defendant. [*Id.* at 169.] At the time, the defendant was wearing jeans and a black t-shirt. [*Id.* at 170.] The defendant was also carrying a cell phone. [*Id.*] Detective Alonzo did not notice that the defendant was injured, and the defendant did not complain of any injuries. [*Id.* at 177, 178.]

Detective Alonzo collected the defendant's clothing, and he observed that there appeared to be blood stains on his clothing. [*Id.* at 171.] In particular, there appeared to be blood stains on the defendant's jeans and on his sneakers. [*Id.* at 174, 176.][10]

On July 11, 2013, Nicole Blair ("Blair") and her family were barbecuing in the back yard of her residence located at Apartment 3 on 30 South 5th Street in Easton, which is near Ferry Street. [*Id.* at 74-76 & Commonwealth's Exhibit 13.] While outside, Blair discovered a knife stuck in the wood on the side of a gate to the back yard. [Day II Tr. at 76.] The knife had a silver and black handle on the front "and it had like tools on it." [*Id.*][11]

---

[10] Timothy Gavel, a forensic scientist with the Pennsylvania State Police, testified that Poncho's DNA was the major contributor of the DNA found on the defendant's jeans. [Notes of Trial – Day Three, 5-8-13 ("Day III Tr."), at 33-34 & Commonwealth's Exhibits 97, 98.]

[11] Blair positively identified Commonwealth's Exhibit 19 as the knife that she found that day. [Day II Tr. at 79-80.]

9

Upon hearing that Blair saw the knife, her husband and brother came over and opened the knife. [*Id.* at 79.] They saw that there was blood on it, and they wrapped it in a tissue and brought it into their apartment. [*Id.*] They thought it was a fishing knife and did not immediately contact the police about locating it. [*Id.* at 79, 81-82.] However, approximately two days after locating the knife, Blair contacted the police after learning about a stabbing up the street from where she lived. [*Id.* at 81-82.] Because Blair, her husband, Brandon Perkins, and her brother, John Blair, touched the knife, they provided the police with DNA samples. [*Id.* at 82.][12]

As part of the police investigation in this case, Inspector Daniel Reagan of the City of Easton Police Department interviewed the defendant at the police station shortly after the police took the defendant into custody on July 4, 2012. [*Id.* at 188-89, 191, 194.][13] Prior to any questioning, Inspector Reagan informed the defendant of his *Miranda* rights and the defendant signed a form indicating that, *inter alia,* Inspector Reagan read the rights to him and he understood his rights. [*Id.* at 189-90.] After the defendant signed the rights form, Inspector Reagan began to discuss the investigation into Poncho's death and some of the evidence with the defendant. [*Id.* at 191.]

Upon Inspector Reagan informing the defendant that the police wanted to hear the defendant's side of the story, the defendant informed Inspector Reagan that he knew Poncho but he was not at the Property and did not kill him. [*Id.* at 191-92.] Despite the defendant indicating that he did not kill Poncho, Inspector Reagan raised the possibility that the defendant acted in self-defense. [*Id.* at 193-94.] The defendant did not acknowledge that he did anything to Poncho or otherwise acted in self-defense. [*Id.* at 193-94, 198-99 & Commonwealth's Exhibit 81.] The

---

[12] After a forensic evaluation, the DNA profile of the knife blade and the handle were a match with Poncho's DNA. [Day III Tr. at 34-35 & Commonwealth's Exhibits 97, 98.]

[13] The interview lasted approximately thirty minutes. [Day II Tr. at 191 & Commonwealth's Exhibit 81.]

defendant also did not mention that he needed any medical attention or had any injuries. [*Id.* at 195.]

Dr. Samuel Land, a forensic pathologist, testified that he performed an autopsy on Poncho on July 3, 2012. [Day III Tr. at 43 & Commonwealth's Exhibit 99.][14] While performing an external examination, Dr. Land noted that Poncho had "multiple areas of trauma" in the nature of "scrapes and abrasions to his head and face[,]" and "multiple stab wounds to the right arm, right groin, right buttocks, and right thigh." [*Id.* at 43, 44.] Regarding the scrapes and abrasions to Poncho's head and face, Dr. Land indicated that Poncho suffered an abrasion to his forehead, a laceration on his right eyelid, abrasions below the left nostril and the left eye, and a series of lacerations, tears, and abrasions on his occipital scalp. [*Id.* at 44-45, 46, 47.] Dr. Land stated that the wounds were sustained at or around the time of Poncho's death and could have been consistent with a fight or fall. [*Id.* at 45, 46, 47.]

As for the stab wounds, Dr. Land explained that Poncho suffered three stab wounds: two to his right buttocks and one to his right posterior thigh. [*Id.* at 50-53.] The two wounds to the buttocks were each about five to six inches in depth, and the wound to the thigh was approximately three inches deep. [*Id.* at 51, 52, 53.] These wounds were not immediately life threatening. [*Id.* at 53.] Poncho also sustained a stab wound to the front of his right bicep that was approximately two inches deep. [*Id.* at 54.] Dr. Land indicated that this wound to Poncho's bicep could be considered as a possible defensive wound. [*Id.* at 54-55, 68-69.][15] In addition to the aforementioned wounds, Poncho received a stab wound to his right groin. [*Id.* at 56.] This particular wound went through the skin, soft tissue, and muscle until completely perforating the

---

[14] Dr. Land was admitted as an expert in the area of forensic pathology without objection by the defendant. [Day III Tr. at 37-38.]

[15] Dr. Land explained that "[w]hen you have stab wounds . . . anywhere on the upper extremities[, they] can be thought of as . . . defensive wounds." [Day III Tr. at 55.]

11

femoral artery – "the main artery that feeds the leg" – and then proceeding further into the muscle of the right thigh. [*Id.*][16] The wound caused "massive bleeding, exsanguination, bleeding out, both externally and into the soft tissues of the thigh and into the back [and pelvis]." [*Id.* at 56-57.] Dr. Land indicated that even if Poncho sustained this particular wound to his femoral artery in an operating room, he still could have potentially died. [*Id.* at 61.]

Dr. Land opined to a reasonable degree of medical certainty that the manner of Poncho's death was homicide and the cause of death was multiple stab wounds. [*Id.* at 62-63.] In addition, the knife that the defendant had in his possession earlier that day (and which had Poncho's DNA on it), could have caused Poncho's stab wounds. [*Id.* at 63 & Commonwealth's Exhibit 19.] Dr. Land noted that even though the knife had a three-inch blade, an individual could still inflict wounds five or six inches deep by applying sufficient force. [*Id.* at 63.]

### 4. Analysis

As illustrated by the aforementioned evidence, we respectfully submit that the Commonwealth presented sufficient evidence to convict the defendant of first-degree murder. Regarding the elements of first-degree murder, the Commonwealth proved that Poncho was dead and that the defendant was responsible for his killing when he stabbed and cut Poncho's femoral artery, causing Poncho to bleed to death. In addition, the defendant clearly acted with malice toward Poncho when he whipped out his knife and repeatedly stabbed him while Poncho was vulnerable and lying on the ground.

Furthermore, although there was no direct evidence in the nature of an admission that the defendant had the specific intent to kill Poncho, there was sufficient circumstantial evidence that the defendant had the specific intent to kill. In this regard, we recognize that Dr. Land stated that

---

[16] The femoral artery is a vital organ that "provides most of the blood for the lower . . . leg." [Day III Tr. at 57-58.] If the femoral artery is damaged, "blood's going to spurt out until the person dies." [*Id.* at 58.]

12

Poncho sustained his injuries to his buttocks, thigh, and biceps, and we have not located any case explicitly holding that those are vital areas of the body even though Dr. Land testified that the femoral artery is a vital organ. *See, e.g., Commonwealth v. Stanton*, 38 A.3d 785, 789 (Pa. 2012) (concluding that evidence showed defendant acted with specific intent to kill when he entered residence with knife and then stabbed victim multiple times, including to heart and left jugular vein); *Commonwealth v. Montalvo*, 956 A.2d 926, 933 (Pa. 2008) (concluding that evidence showed that defendant acted with specific intent to kill when defendant stabbed victim in her eyes and neck). Nonetheless, the Commonwealth showed that the defendant, upon getting off of the ground after Poncho hit him across the back with the stick, got up, pulled out his knife, and said something similar to "Oh, it's like that? Yeah, it's like that." He then went after Poncho while Poncho was on the ground and used the knife, a deadly weapon, to stab him <u>five</u> times, including two times in the buttocks, one time in the thigh, one time in the bicep, and another time in the groin. The fatal wound was so deep that it penetrated the muscle, completely cut the femoral artery, and then traveled through the muscle again. The wounds to the buttocks were approximately twice as deep as the length of the blade and, as Dr. Land noted, needed sufficient force to go so deep into the body. The only reason why the defendant stopped stabbing Poncho was because Williams pulled him off of Poncho. The defendant then fled and attempted to hide the knife.

Thus, the defendant used a deadly weapon to stab Poncho five times until Williams was able to extricate the defendant from Poncho. Even though there was no evidence that the defendant knew about the femoral artery and its vitality to the human body, the jury could find that the defendant acted with the specific intent to kill Poncho when he stabbed him not once, but five times while Poncho was on the ground. The defendant had time to get off the ground,

13

recover, pull out his knife, make a statement, and then attack Poncho while Poncho was on the ground. The defendant was also not stabbing Poncho to keep Poncho away from him, since Poncho was still on the ground with the broken stick in his hand when the defendant pulled out his knife.

In addition to the Commonwealth proving the elements of first-degree murder, there was sufficient evidence showing that the defendant did not act in self-defense when he stabbed Poncho. The General Assembly has codified this defense in pertinent part as follows:

> **(a) Use of force justifiable for protection of the person.**--The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
>
> **(b) Limitations on justifying necessity for use of force.**--
>
> \* \* \*
>
> (2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:
>
> (i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or
>
> (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.
>
> (2.1) Except as otherwise provided in paragraph (2.2), an actor is presumed to have a reasonable belief that deadly force is immediately necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat if both of the following conditions exist:
>
> (i) The person against whom the force is used is in the process of unlawfully and forcefully entering, or has unlawfully and forcefully entered and is present within, a dwelling, residence or occupied vehicle; or the person against whom the force is used is or is attempting to unlawfully and forcefully remove another against that other's will from the dwelling, residence or occupied vehicle.

14

(ii) The actor knows or has reason to believe that the unlawful and forceful entry or act is occurring or has occurred.

(2.2) The presumption set forth in paragraph (2.1) does not apply if:

(i) the person against whom the force is used has the right to be in or is a lawful resident of the dwelling, residence or vehicle, such as an owner or lessee;

(ii) the person sought to be removed is a child or grandchild or is otherwise in the lawful custody or under the lawful guardianship of the person against whom the protective force is used;

(iii) the actor is engaged in a criminal activity or is using the dwelling, residence or occupied vehicle to further a criminal activity; or

(iv) the person against whom the force is used is a peace officer acting in the performance of his official duties and the actor using force knew or reasonably should have known that the person was a peace officer.

(2.3) An actor who is not engaged in a criminal activity, who is not in illegal possession of a firearm and who is attacked in any place where the actor would have a duty to retreat under paragraph (2)(ii) has no duty to retreat and has the right to stand his ground and use force, including deadly force, if:

(i) the actor has a right to be in the place where he was attacked;

(ii) the actor believes it is immediately necessary to do so to protect himself against death, serious bodily injury, kidnapping or sexual intercourse by force or threat; and

(iii) the person against whom the force is used displays or otherwise uses:

(A) a firearm or replica of a firearm as defined in 42 Pa.C.S. § 9712 (relating to sentences for offenses committed with firearms); or

(B) any other weapon readily or apparently capable of lethal use.

(2.4) The exception to the duty to retreat set forth under paragraph (2.3) does not apply if the person against whom the force is used is a peace officer acting in the performance of his official duties and the actor using force knew or reasonably should have known that the person was a peace officer.

(2.5) Unless one of the exceptions under paragraph (2.2) applies, a person who unlawfully and by force enters or attempts to enter an actor's dwelling, residence or occupied vehicle or removes or attempts to remove another against that other's

15

will from the actor's dwelling, residence or occupied vehicle is presumed to be doing so with the intent to commit:

(i) an act resulting in death or serious bodily injury; or

(ii) kidnapping or sexual intercourse by force or threat.

(2.6) A public officer justified in using force in the performance of his duties or a person justified in using force in his assistance or a person justified in using force in making an arrest or preventing an escape is not obliged to desist from efforts to perform such duty, effect such arrest or prevent such escape because of resistance or threatened resistance by or on behalf of the person against whom such action is directed.

(3) Except as otherwise required by this subsection, a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used, without retreating, surrendering possession, doing any other act which he has no legal duty to do or abstaining from any lawful action.

\* \* \*

**(d) Definition.**--As used in this section, the term "criminal activity" means conduct which is a misdemeanor or felony, is not justifiable under this chapter and is related to the confrontation between an actor and the person against whom force is used.

18 Pa.C.S. § 505.

Additionally, our appellate courts have explained that the defense of self-defense

requires evidence establishing three elements: "(a) [that the defendant] reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat." *Commonwealth v. Samuel*, 527 Pa. 298, 590 A.2d 1245, 1247–48 (1991). *See also Commonwealth v. Harris*, 550 Pa. 92, 703 A.2d 441, 449 (1997); 18 Pa.C.S. § 505. Although the defendant has no burden to prove self-defense, *see* discussion below, before the defense is properly in issue, "there must be some evidence, from whatever source, to justify such a finding." Once the question is properly raised, "the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in self-defense." *Commonwealth v. Black*, 474 Pa. 47, 376 A.2d 627, 630 (1977). The Commonwealth sustains that burden of negation "if it proves any of the following: that the slayer was not free from fault in provoking or continuing the

16

difficulty which resulted in the slaying; that the slayer did not reasonably believe that [he] was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save [him]self therefrom; or that the slayer violated a duty to retreat or avoid the danger." *Commonwealth v. Burns,* 490 Pa. 352, 416 A.2d 506, 507 (1980).

*Commonwealth v. Mouzon,* 53 A.3d 738, 740-41 (Pa. 2012) (internal footnote omitted).

Here, we note that the Commonwealth argued at trial that the altercation between the defendant and Poncho consisted of one continuous episode starting when the defendant confronted Poncho as Poncho was knocking on the door and attempting to purchase drugs. To the extent that the evidence showed that the altercation between the defendant and Poncho consisted of one continuous episode, the jury properly found that the defendant did not act in self-defense since the evidence shows that the defendant provoked the confrontation with Poncho and was the initial aggressor by sucker punching Poncho and then continuously punching and kicking him until Williams was able to pull the defendant off of Poncho. Although Poncho and the defendant were arguing, the defendant escalated the encounter with Poncho by punching him (and then repeatedly punching him). There was no testimony that Poncho threatened or otherwise acted in a manner warranting the defendant punching him. Thus, the defendant clearly was not free from fault in provoking or continuing the difficulty, which resulted in Poncho's slaying.

Even if there were two independent episodes, there was still sufficient evidence to show that the defendant did not act in self-defense when he killed Poncho with the knife. In the first instance, there was insufficient evidence showing that the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against Poncho to prevent such harm. We recognize that

[t]he requirement of a reasonable belief encompasses two aspects, one subjective and one objective. First, the defendant "must have acted out of an honest, bona

17

fide belief that he was in imminent danger," which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis.

*Commonwealth v. Mouzon*, 53 A.3d 738, 752 (Pa. 2012) (citing *Commonwealth v. Light*, 326 A.2d 288 (1974)).

In this case, the defendant did not testify and there were no specific statements by him to the police in which he described his subjective thinking during the altercation with Poncho. Instead, although Inspector Reagan specifically asked the defendant whether he acted in self-defense, the defendant denied being there or otherwise harming Poncho. Also, although Williams testified that immediately preceding the defendant repeatedly stabbing Poncho, he said something similar to "oh, it's like that? Yeah, it's like that," it is unclear what the defendant meant through this statement other than, we submit, he was consciously deciding to use deadly force against Poncho. Nonetheless, for the most part, the defendant relied upon the observations of the other witnesses, particularly Williams, to support his assertion of self-defense and that he had a reasonable belief that deadly force was necessary. We submit that there is no evidence in the record as to whether the defendant actually believed that he was in imminent danger when he decided to use deadly force against Poncho by stabbing him with his knife, which he apparently had on his person throughout the encounter with Poncho.

In addition, we submit that an objective review of the evidence does not show that deadly force was necessary under the circumstances in the case. At the time that the defendant used deadly force, Poncho was still on the ground having not recovered from falling onto the ground. Although Williams testified that Poncho still had part of the stick in his hand, there was no evidence that he was in the position to use it at the time in a manner that would threaten the

18

defendant. The defendant was not in a position where it was necessary to use deadly force against Poncho.

Finally, the Commonwealth demonstrated that the defendant violated the duty to retreat. As indicated above, "[t]he use of deadly force is not justifiable . . . if . . . *the actor knows that he can avoid the necessity of using such force with complete safety by retreating.*" 18 Pa.C.S. § 505(b)(2)(ii) (emphasis added). Prior to 2011, Section 505 provided an exception to the general duty to retreat if the actor was attacked in the actor's dwelling or place of work, unless the actor was "the initial aggressor or [wa]s assailed in his place of work by another person whose place of work the actor knows it to be." *Id.* Thus, if the attack occurred in a place other than a dwelling or a place of work, the actor possibly had the duty to retreat.

In 2011, the General Assembly amended section 505 to include a "stand your ground" provision, which provided an exception to the duty to retreat. *See* P.L. 48, No. 10, § 2 (enacted June 28, 2011; effective Aug. 29, 2011). As stated above, this subsection provides as follows:

> (2.3) An actor who is not engaged in a criminal activity, who is not in illegal possession of a firearm and who is attacked in any place where the actor would have a duty to retreat under paragraph (2)(ii) has no duty to retreat and has the right to stand his ground and use force, including deadly force, if:
>
> (i) the actor has a right to be in the place where he was attacked;
>
> (ii) the actor believes it is immediately necessary to do so to protect himself against death, serious bodily injury, kidnapping or sexual intercourse by force or threat; and
>
> (iii) the person against whom the force is used displays or otherwise uses:
>
> (A) a firearm or replica of a firearm as defined in 42 Pa.C.S. § 9712 (relating to sentences for offenses committed with firearms); or
>
> (B) any other weapon readily or apparently capable of lethal use.

18 Pa.C.S. § 505(b)(2.3).

19

Here, Poncho attacked the defendant in the street when he hit him over the back with the stick/handrail. Thus, pursuant to section 505(b)(2.3), the defendant did not have a duty to retreat if all of the elements contained therein were present. We respectfully submit that the Commonwealth demonstrated that the evidence does not satisfy these elements. In this regard, we recognize that at the time of the attack, the defendant was not engaging in any criminal activity because for purposes of this analysis the initial fight had concluded. In addition, there was no indication that the defendant did not have the right to be in the street at the time. Nonetheless, and as explained in more detail above, there was no evidence showing that the defendant believed that he had the right to stand his ground because it was immediately necessary to protect himself against death or serious bodily injury. At the time that the defendant decided to use deadly force, Poncho was on the ground and the defendant was standing. Although Poncho still had a piece of the stick in his hand, there is no evidence that he was in any position to immediately cause the defendant to die or suffer serious bodily injury. Even if Poncho still had a piece of the stick, at least half of it had shattered over the defendant's back and the remainder of the stick itself was highly unlikely to cause any further injury.

Furthermore, we submit that the Commonwealth demonstrated that the stick itself was not a "weapon readily or apparently capable of lethal use."[17] In particular, as described by Williams, Poncho hit the defendant over the back with a big stick that could have been a handrail. The stick was old and not "real sturdy." Although Williams was concerned about being hit by the stick, he indicated that he was not concerned about dying even if he was hit. In addition, we note that at the time that the defendant decided to use deadly force against Poncho, at least half of the old stick had broken and only part of it remained in Poncho's hand. None of this evidence supports a conclusion that the "big stick" or handrail was a weapon readily or

---

[17] The Commonwealth introduced the stick at trial and the jury had the opportunity to view the stick.

20

apparently capable of lethal use. Because the Commonwealth showed that the stick was a not a weapon readily or apparently capable of lethal use, the defendant had the duty (and the ability) to retreat from the encounter once he got to his feet and Poncho remained on the ground. Accordingly, the Commonwealth proved that the defendant violated his duty to retreat from the encounter and that the defendant's decision to use deadly force against Poncho was not justified under the circumstances.

In addition to the Commonwealth proving that the defendant did not kill Poncho in self-defense, it also showed that the defendant was not entitled to a voluntary manslaughter conviction because of an imperfect self-defense. This "derivative and lesser defense of imperfect belief self-defense is imperfect in only one respect—an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life. All other principles of justification under 18 Pa.C.S. § 505 must [be satisfied to prove] unreasonable belief voluntary manslaughter." *Commonwealth v. Sepulveda*, 55 A.3d 1108, 1124 (Pa. 2012) (internal quotation marks and citations omitted). "Thus, for example, if the defendant was not free from fault, neither self-defense nor imperfect self-defense is a viable defense." *Id.* at 1124-25.

As explained above, if the entire encounter was one episode, the defendant provoked the use of force by Poncho by engaging in conduct showing that it was his intent to cause serious bodily injury to him. Even if the encounter could be split into two episodes, with Poncho initiating the second episode by striking the defendant over the back with the stick, the Commonwealth demonstrated that the other principles of section 505 were not satisfied insofar as the defendant did not have a reasonable belief that it was necessary to use deadly force and he violated his duty to retreat.

21

## B. Alleged Wrongful Exclusion of Defense Witness

In his second matter complained of, the defendant asserts that we erred in excluding a defense witness that would have testified that Poncho wielded a weapon that was readily or apparently capable of lethal use. As discussed below, this allegation of error lacks merit.

The appellate court's standard of review concerning a trial court's ruling concerning the admissibility of evidence is as follows:

> The admissibility of evidence is within the sound discretion of the trial court, wherein lies the duty to balance the evidentiary value of each piece of evidence against the dangers of unfair prejudice, inflaming the passions of the jury, or confusing the jury. *Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 623 (Pa. 2010); *Commonwealth v. Dillon*, 592 Pa. 351, 925 A.2d 131, 141 (Pa. 2007). We will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion. *Flor*, 998 A.2d at 623; *Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403, 416 (Pa. 2003).

*Commonwealth v. Chamberlain*, 30 A.3d 381, 420 (Pa. 2011).

Although the defendant has not specifically identified the witness that we precluded from testifying, it appears that he is referring to Sergeant Timothy Hornbaker of the Northampton County Sheriff's Department. On the third day of trial, and prior to the Commonwealth concluding its case-in-chief, defense counsel informed the court that he intended to call Sergeant Hornbaker as a witness. [Day III Tr. at 14.] Defense counsel indicated that he intended to elicit testimony from Sergeant Hornbaker concerning "how many deputies are in the courtroom, what they carry on their utility belts, and what he would do if I picked up a stick and tried to attack somebody in the courtroom." [*Id.*] The Commonwealth opposed this proposed testimony. [*Id.* at 15.]

After we informed defense counsel that we were not inclined to permit Sergeant Hornbaker to testify because doing so would intrude upon the province of the jury, defense counsel stated that he would seek to offer Sergeant Hornbaker as "an expert in the protection of

22

people and use of force." [*Id.* at 15-16.] Defense counsel would then ask a hypothetical question with facts similar to those presented by the Commonwealth in this case, and he would ask Sergeant Hornbaker "[w]ould you let that happen?" [*Id.* at 16.] We then heard further argument from counsel, but precluded the testimony because it would intrude upon the province of the jury. [*Id.* at 16-20.]

Once the Commonwealth rested its case, we informed the defendant that the Supreme Court of Pennsylvania's decision in *Commonwealth v. Light,* 326 A.2d 288 (1975) also supported our decision to preclude Sergeant Hornbaker from testifying in accordance with the offer of proof. [*Id.* at 74.] At this point, defense counsel conceded that he could not ask Sergeant Hornbaker questions about whether the defendant acted reasonably because that would invade the province of the jury. [*Id.* at 75.] Nonetheless, he stated that he would ask Sergeant Hornbaker whether he would permit anyone in the courtroom to strike another person with the remainder of the stick used by Poncho. [*Id.*]

We then inquired of defense counsel about the proposed relevance of this testimony and he stated as follows:

> MR. SLETVOLD: I think it goes to the objective facts that you can't go around and hit people with sticks and it's appropriate to stop them, whether it was appropriate in this case, whether it ultimately meets part of the definition of the charges they charged him with, I think that's up to the jury.
>
> But I would like to argue with the facts of record that certain -- drawing a hypothetical to match these facts I should be given that opportunity.

[*Id.* at 76.] Based on counsel's proffer, we reiterated our prior ruling that we would not permit Sergeant Hornbaker to testify. [*Id.*] Shortly thereafter, the defendant rested his case without testifying. [*Id.* at 81.]

23

We respectfully submit that we properly precluded the defense from introducing Sergeant Hornbaker's testimony in light of the proffer by defense counsel. As we indicated to defense counsel during our conferences on this issue, the proposed testimony was irrelevant. "[T]he threshold inquiry for the admission of evidence is whether particular evidence is relevant." *Commonwealth v. Cook*, 952 A.2d 594, 612 (Pa. 2008) (citations omitted). "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401. "All relevant evidence should be admitted unless a specific rule bars its admission." *Commonwealth v. Dean*, 693 A.2d 1360, 1367 (Pa. Super. 1997).

Defense counsel failed to articulate any manner in which Sergeant Hornbaker's testimony would be relevant and admissible in this case. As the Court explained in *Commonwealth v. Light*, the defense of self-defense contains both a subjective and an objective element. 326 A.2d at 292. The Court then pointed out that although expert testimony in the nature of psychiatric testimony regarding the subjective element, *i.e.*, whether the defendant used deadly force because of an "honest, bona fide belief that he was in imminent danger," was generally admissible, such testimony concerning the objective element, *i.e.* whether the defendant's belief that he was in immediate danger was reasonable in light of the facts as to they appeared to him, was inadmissible. *Id.*

Here, the defendant was not seeking to introduce psychiatric testimony about himself to show the subjective element of self-defense. Instead, the testimony solely related to the reasonableness of the defendant's actions in light of the circumstances presented there. The defense sought to have Sergeant Hornbaker testify as to what he would do under those circumstances. Additionally, any testimony about what Sergeant Hornbaker, a law enforcement

24

officer, would have done if someone attempted to strike another individual with a stick while in the courtroom was wholly irrelevant to this case because (1) Sergeant Hornbaker possesses different responsibilities as a law enforcement officer, and (2) the facts of this case do not involve someone being struck with a stick in the courtroom.

We also note that while the defendant has claimed in his concise statement that we prevented (presumably) Sergeant Hornbaker from testifying about whether the stick was readily or apparently capable of lethal use, defense counsel did not state in his proffer (or in his argument) that was the reason that he sought to have the sergeant testify. Instead, the only reference that we could locate on this issue was made during our charge conference with counsel. During this conference, the parties were discussing whether the stick was readily or apparently capable of lethal use when defense counsel stated "[i]f I could have called the sheriff, I think it would have been readily apparent. And what that stick -- I'm sorry, what that flimsy little piece of wood -- as the Commonwealth would have the jury believe." [*Id.* at 116-17.] Prior to this reference by defense counsel, there were no indications that the defendant sought to have Sergeant Hornbaker testify about whether the stick was a weapon readily or apparently capable of lethal use. As such, the defendant never presented this issue and we did not have to rule on the issue. The defendant's failure to raise this issue constitutes a waiver of the issue on appeal. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").[18]

---

[18] We note that although the defense indicates that we erred in precluding Sergeant Hornbaker's testimony on this issue, there is no indication in the record that Sergeant Hornbaker would have testified in favor of the defendant's position that the stick was readily or apparently capable of lethal use.

25

## III. Conclusion

For the reasons stated herein, we respectfully submit that the defendant's allegations of error are without merit and the judgment of sentence entered on May 9, 2013, should properly be affirmed.

BY THE COURT:

_____
EDWARD G. SMITH, J.

Date: October 25, 2013

26